222 F.2d 721
 SILVER PINE OIL COMPANY, Complainant,
v.
RECONSTRUCTION FINANCE CORPORATION, Respondent.
 No. 660.
 United States Emergency Court of Appeals.
 Heard at Tyler, Texas, November 20, 1954.
 Decided May 16, 1955.
 
 J. Donald Guinn, Tyler, Tex., with whom Spruiell, Lowry, Potter & Lasater, Tyler, Tex., on the brief, for complainant.
 Maurice S. Meyer, Attorney, Department of Justice, Washington, D. C., with whom Warren E. Burger, Asst. Atty. Gen., and Marvin C. Taylor, Attorney, Department of Justice, Washington, D. C., on the brief, for respondent.
 Before MARIS, Chief Judge, and McALLISTER, and LINDLEY, Judges.
 McALLISTER, Judge.
 
 
 1
 The Silver Pine Oil Company, complainant herein, was paid certain government subsidies for purchases of oil during 1945 and 1946, under the subsidy program of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq. On the claim of the government that the subsidies had been overpaid, the Reconstruction Finance Corporation, acting as the government agent, entered an order invalidating the subsidies, and upon the company's refusal to refund the amount claimed, brought suit in the District Court for the Eastern District of Texas, and secured a judgment against the company in the full amount of its claim. Thereafter, upon the application of complainant, the district court granted a stay of execution and leave to the company to file complaint in the Emergency Court of Appeals to set aside the order of the Reconstruction Finance Corporation invalidating the subsidies. That complaint was dismissed by this court for want of jurisdiction. Silver Pine Oil Co. v. Reconstruction Finance Corp., Em.App., 1953, 205 F.2d 835.
 
 
 2
 Thereafter, the Silver Pine Oil Company, by promptly filing a protest against the order of the Reconstruction Finance Corporation invalidating the subsidies, secured an order from the district court staying execution of the judgment theretofore entered in the cause between the parties, pending termination of the protest proceeding. The company's protest, which was based upon the ground that the order of the Reconstruction Finance Corporation invalidating the subsidies was arbitrary, capricious, unlawful, and unsupported by substantial evidence, was denied by the Reconstruction Finance Corporation; and a judicial determination of the validity of that order is now sought on review in this court under the provisions of the Emergency Price Control Act. Such a determination that the order of the Reconstruction Finance Corporation is invalid would entitle the company to have the judgment of the district court vacated, in accordance with the provisions of the Act. See Silver Pine Oil Co. v. Reconstruction Finance Corp., supra.
 
 
 3
 The background of the case is as follows: In two counties of East Central Texas, Freestone County and Limestone County, there exists what has been described by the parties to this suit as an old, shallow, oil-producing field known as the Wortham Field. Between 1941 and 1946, certain persons, at considerable expense, drilled oil wells between the old, used, and nonproducing wells and brought in so-called stripper wells, from which they secured quantities of oil. The only oil and refining company in this region to which the oil so produced could be sold was the Humble Oil and Refining Company that maintained what is designated as the Simmons Storage Tank, twelve miles distant from the oil wells in the Wortham Field.
 
 
 4
 The owners of the oil lands, as well as the lessees of the oil rights in the Wortham Field, were unable to induce any purchaser of oil or any pipeline company to lay a pipeline to their leases. In order to sell the oil accumulated in the Wortham Field to the Humble Oil and Refining Company, the lease owners constructed a twelve-mile pipeline from the Wortham Field to the Simmons Storage Tank which was owned by Humble. There, the oil, after being transported through the pipeline, was sold to Humble at Humble's highest posted purchase price for the Wortham pool.
 
 
 5
 The oil and gas leases in the Wortham Field, relevant to this case, were owned and operated by the following parties in the stated proportions of ownership:
 
 
 6
 Barney Carter 85%
 D. D. Alexander 10%
 Dr. C. L. Tubbs 2½%
 Gus Allen Estate 2½%
 
 
 7
 These parties will hereafter be referred to as the lease owners; and the owners of the one-eighth royalty interest reserved from the above leases by the landowners, will be referred to as the royalty owners.
 
 
 8
 The lease owners, who found that it was necessary to build the pipeline as a gathering system from the Wortham Field to the Simmons Storage Tank, owned the pipeline in the same proportional interests as they owned the leases, as above set forth.
 
 
 9
 Upon the completion of the pipeline, a corporation, the Silver Pine Oil Company, was formed. This company was owned entirely by Barney Carter, the largest proportional owner of the oil leases and the pipeline.
 
 
 10
 The Silver Pine Oil Company was formed to purchase the oil produced at the Wortham Field and to sell it to the Humble Company at the Simmons Storage Tank.
 
 
 11
 The Silver Pine Oil Company purchased the oil from the royalty owners and the lease owners of the Wortham Field, and paid them for it; and sold the oil to the Humble Oil Company. The Silver Pine Oil Company received $1.27 a barrel from the Humble Company. It paid everything it received for the oil to the royalty owners and the lease owners.
 
 
 12
 The Silver Pine Oil Company made claim for the subsidies in this case, as the purchaser of the oil at the highest posted purchase price for the pool; it received the subsidies from the government; it insists that it is entitled to them; and it contends that the order of the Reconstruction Finance Corporation invalidating them and requiring them to be refunded is arbitrary, capricious, and unlawful.
 
 
 13
 The claim of the Silver Pine Oil Company to the subsidies is based upon the Emergency Price Control Act and the regulations issued thereunder. These regulations provided for the payment of the subsidies "to reimburse purchasers for amounts expended for crude oil, the maximum price for which is increased pursuant to this Directive, in excess of amounts that such purchasers would have been permitted to pay on the basis of maximum prices as they existed prior to the increases herein authorized."
 
 
 14
 The formula for determining the maximum prices for crude oil, insofar as pertinent to this case, was as follows: Where, on October 1, 1941, there was no posted purchase price for any given area or pool, or where there was more than one posted purchase price, the maximum price for a particular operator at the receiving tank for crude petroleum from any such pool, was the price paid for crude petroleum at any receiving tank of the same operator, as of October 1, 1941 — unless this price was below the highest of the posted purchase prices, if any; and in that case, the maximum price would be the highest posted purchase price.
 
 
 15
 It is not necessary to go into intricate details to explain the basis on which persons would be entitled, under the Emergency Price Control Act, to subsidies from the government on crude oil purchases. It is sufficient, for the purpose of this case, to say that whether complainant is entitled to the claimed subsidies depends upon whether it paid the maximum or highest posted purchase price for the crude oil which it purchased from the Wortham Field. If it did, it is entitled to the claimed subsidies; if it did not, its claim fails.
 
 
 16
 The first question to be determined is what was the highest posted purchase price for crude oil during the transactions here in question.
 
 
 17
 The regulation above mentioned, setting forth the formula for determining the maximum price for crude oil, provides that the maximum price shall be the highest posted purchase price for any given pool.
 
 
 18
 In the presentation of its case, complainant was confronted by a dilemma. Because of agreements with and between the lease and royalty owners, complainant's bookkeeping entries showed certain payments which were made to the royalty and lease owners as being allocated for oil, and certain payments as being allocated to the lease owners for the use of the pipeline. The payments shown in its bookkeeping entries as allocated for the oil were at the rate of $1.20 per barrel. Respondent, Reconstruction Finance Corporation, contends that the highest posted purchase price was $1.27 per barrel. Accordingly, on this phase of the case, in the light of respondent's contentions that the company had paid less than the highest posted purchase price and was, therefore, not entitled to the subsidies claimed, complainant first sought to show that $1.20 per barrel was the highest posted purchase price for the pool.
 
 
 19
 It, however, appears that the Wortham pool is a long, narrow pool running from north to south. At the southerly lease in the pool, where Humble had been purchasing oil, it had a posted purchase price of $1.27 per barrel. Under the regulation, the highest posted purchase price is the highest posted purchase price for any given pool. However, Humble would not build a pipeline to the Wortham Field where the leases concerned in this case were located. Complainant, therefore, argues that since Humble would not buy the oil at their leases at the Wortham pool, it cannot be said that Humble's highest posted purchase price applied to the entire Wortham pool, but only to the southerly portion where it had a pipeline and where it bought oil from the pool; and complainant submits that the test as to the highest posted purchase price at a given point should be what the oil could be sold for at that point. There is logic in complainant's argument; but we are bound to follow the regulation which provided that the maximum price shall be the highest posted purchase price at a given pool. The given pool in this case is the Wortham pool and the highest posted purchase price at that pool during the period in question was $1.27 per barrel posted by the Humble Company.
 
 
 20
 We come to the crucial question: Did the Silver Pine Oil Company pay the highest posted purchase price for the crude oil which it purchased from the Wortham pool and sold to the Humble Company? If Silver Pine did not pay such highest posted purchase price, it is conceded that it would not be entitled to the subsidies which it claims.
 
 
 21
 We start with the fact that the highest posted purchase price for the oil which the Silver Pine Oil Company bought from the Wortham Field was $1.27 per barrel. The company received from Humble $1.27 per barrel. It paid to the royalty owners and lease owners $1.27 per barrel. It is our conclusion that the Silver Pine Oil Company paid the highest posted purchase price for the oil from the Wortham Field. A purchaser who pays the highest posted purchase price is entitled to the oil subsidies. In this case, the Silver Pine Oil Company is entitled to the subsidies claimed.
 
 
 22
 It is argued by the Reconstruction Finance Corporation that the books of the Silver Pine Oil Company show that it purchased the oil for $1.20 per barrel; and that it deducted from the amount of $1.27 per barrel which it received from the Humble Oil Company the sum of 7 cents per barrel as a reasonable gathering charge for the use of the pipeline. Obviously, if it deducted from the lease and royalty owners 7 cents per barrel for the expense of transportation, and retained it, it could not contend that it paid $1.27 for the oil. But it did nothing of the kind. The Company paid everything it received — the entire sum of $1.27 per barrel — to the royalty and lease owners. Confusion is introduced into the case by calling the 7 cents paid to the lease owners a deduction, as it implies that the company deducted this amount for its own benefit, or for its own indebtedness. It was not, in fact, a deduction, but rather a division of the purchase price, directed to be made by the royalty and lease owners. For it appears that, as between themselves, the royalty owners and the lease owners entered into an agreement as to how the $1.27 would be split up among them. But this was of no concern to the Reconstruction Finance Corporation, or to the Humble Company, or to the Silver Pine Oil Company — except that the latter agreed to distribute the money which it was paying for the oil in accordance with the wishes of the royalty and lease owners who were selling the oil to it. The Silver Pine Oil Company did not charge anything for its service. It did not become indebted to anyone for the cost of transporting the oil; and it was not paying 7 cents per barrel for any such indebtedness on its part. It made nothing and lost nothing by the transaction. It remitted $1.27 a barrel, so that it must have bought the oil for not less than that price. If it had purchased the oil for $1.20 per barrel, as contended by the Reconstruction Finance Corporation, it would have profited at the rate of 7 cents per barrel; and it would have owed for the cost of transporting the oil. It did not profit, and it did not owe. The company was not getting the oil for less than $1.27 per barrel. It could not be said that it paid more or less for the oil because of the way the sellers wanted their money divided. The aggregate of the amount which the Silver Pine paid the royalty owners and lease owners was for the oil which it purchased from them. Because of the nature of the ownership of the oil, the way in which the purchase money was to be distributed to the sellers was of no concern to anyone except to those who were entitled to payment therefor; and they might, conceivably, have asked the Silver Pine Oil Company to make out the payments in checks for a hundred different items, such as payments to creditors for expenses of production of the oil, labor bills, costs of tanks, and the like. The fact that the royalty owners, knowing that Humble would never build a pipeline to the Wortham Field, agreed with the lease owners to contribute to the cost of constructing the pipeline so that the oil could be sold by directing the Silver Pine Oil Company to give part of their one-eighth share to the lease owners for such an expense of production, does not bear upon what the Silver Pine Oil Company paid for the oil. Briefly, what the royalty owners and the lease owners required of the Silver Pine Oil Company was that it pay them $1.27 for the oil, and distribute the payments so that the sum of 7 cents per barrel first went to the lease owners for the expenses of production incurred by them, and the balance, in the proportion of one-eighth to the royalty owners, and seven-eighths to the lease owners.
 
 
 23
 From the foregoing, it is our conclusion that complainant, Silver Pine Oil Company, paid the highest posted purchase price for the oil in question and is entitled to the subsidy claimed. The order of the Reconstruction Finance Corporation invalidating the subsidy claims on the ground that complainant did not pay the highest posted purchase price is unsupported by, and contrary to, the evidence.
 
 
 24
 A judgment will, accordingly, be entered, setting aside the order of the Reconstruction Finance Corporation invalidating the subsidy claims, as well as its order denying complainant's protest.